NOTICE
Decision filed 05/05/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 190499-U

NO. 5-19-0499

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF Y.S., | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Madison County. |
| | ) | |
| and | ) | No. 17-D-940 |
| | ) | |
| Q.L., | ) | Honorable |
| | ) | A. Ryan Jumper, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE OVERSTREET delivered the judgment of the court.
Justices Moore and Wharton concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The circuit court's judgment granting the petitioner's request to relocate the parties' minor children and initially allocating the parties' parenting time and decision-making responsibilities is affirmed where the respondent's contentions of error were without merit.

¶ 2   The parties, Y.S. and Q.L., were married in February 2004. In October 2017, Y.S. filed a petition for dissolution of marriage, and in May 2018, she filed a petition to relocate the parties' minor children to Indiana. In August 2019, the circuit court granted the petition to relocate and allocated the parties' parenting time and decision-making responsibilities. On appeal, Q.L. advances numerous arguments in support of his contention that we should

reverse the circuit court's judgment and remand the cause for a new trial. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4     The parties are naturalized American citizens from China. They were married on February 10, 2004, in South Bend, Indiana, where they both received doctorate degrees in engineering from the University of Notre Dame. They subsequently had two children: a daughter, B.L., who was born February 24, 2009, and a son, J.L., who was born December 10, 2014.

¶ 5     On October 31, 2017, citing irreconcilable differences, Y.S. filed a petition for dissolution of marriage in the circuit court of Madison County. The petition noted that the parties were both 42 years old, that their children were both minors, that Q.L. was employed as a research scientist in St. Peters, Missouri, and that Y.S. was employed as a professor at Southern Illinois University Edwardsville (SIUE). The petition requested that the court equitably divide the parties' debts and assets but requested no relief with respect to the children.

¶ 6     On November 16, 2017, Y.S. obtained an order of protection against Q.L., and the circuit court entered an agreed order establishing a temporary parenting time schedule. Pursuant to the temporary schedule, Q.L. was granted parenting time with the minors on Mondays through Fridays from 7 p.m. to 8:30 p.m. and on Sundays from 9 a.m. to 5 p.m. The record indicates that after November 16, 2017, the parties and the children continued to reside together at the marital home in Glen Carbon, and the order of protection was dismissed.

¶ 7　On May 1, 2018, Y.S. filed a petition for leave to remove the minor children to Evansville, Indiana. The petition advised that Y.S. had recently accepted a position at the University of Evansville's college of engineering and computer science and that the job provided better pay and benefits than her present position at SIUE. The petition alleged that the proposed move would be in the children's best interests and would enhance their general quality of life. The petition further alleged that a suitable parenting time schedule could be fashioned to allow Q.L. a reasonable amount of parenting time with the minors. The petition specifically requested that Y.S. be granted leave to relocate the children to Evansville and that a "reasonable parenting time schedule" be established for Q.L.

¶ 8　On May 9, 2018, Q.L. filed an answer to Y.S.'s petition for leave to remove, alleging that Y.S.'s proposed relocation would not be in the minors' best interests and would severely impair his relationships with the children. Q.L. also filed a petition to appoint a guardian *ad litem* (GAL) to represent the children's best interests, alleging that appointing a GAL would be appropriate given that the issues pending before the court involved parenting time and a request to relocate.

¶ 9　On May 23, 2018, the circuit court ordered the parties to engage in mediation and appointed attorney Amy Sholar to act as the minors' GAL (see 750 ILCS 5/506(a)(2) (West 2018); Ill. S. Ct. Rs. 905, 907 (eff. Mar. 8, 2016)). Pursuant to Illinois Supreme Court Rule 907, the GAL was thus required to "adhere to all ethical rules governing attorneys in professional practice, be mindful of any conflicts in the representation of children and take appropriate action to address such conflicts." Ill. S. Ct. R. 907(a) (eff. Mar. 8, 2016). The circuit court's appointment order specifically granted the GAL the authority to interview

3

persons with special knowledge about the children's circumstances, and the court's mediation order specifically directed that the parties' mediation address "the issues of parental responsibilities, guardianship, and/or parenting time."

¶ 10 On August 1, 2018, Y.S. moved to Evansville to begin her new job, and the circuit court entered an order establishing a second temporary parenting time schedule. By agreement, Q.L. was granted custody of the children during the week, and Y.S. was awarded parenting time at the marital home in Glen Carbon every weekend. Y.S. was also awarded parenting time at her residence in Evansville for Labor Day weekend and several days during the 2018 Thanksgiving and Christmas holiday breaks. The circuit court ordered that the custody exchanges for the children's visits to Evansville take place in Mt. Vernon, Illinois.

¶ 11 On August 9, 2018, Q.L. served Y.S. with "Interrogatories Pertaining to Allocation of Parental Responsibilities/Parenting Time," which included numerous questions specifically directed to the issue of the allocation of the parties' parenting time. Y.S. submitted her responses to the interrogatories on August 28, 2018.

¶ 12 On May 22, 2019, after several case management conferences, the circuit court entered an order setting the cause for a July 19, 2019, trial on Y.S.'s proposed relocation and the allocation of the parties' parenting time. The court's docket entry setting the trial date specifically noted that the cause was being set for a "relocation hearing/parenting time[;] other issues reserved for later hearing." The court's order noted that the parties had completed their mediation as ordered but had not yet submitted their proposed parenting plans. The order indicated that all discovery had been completed and that a continuance of

4

the trial setting would only be granted in the event of "extreme circumstances." The order directed the parties to file their position papers by July 12, 2019.

¶ 13    On June 7, 2019, the GAL completed a 22-page report and recommendation, which she electronically mailed to the parties and the circuit court. The report was filed under seal on June 12, 2019.

¶ 14    In her report to the court, the GAL stated that she had met and spoken with the parties and the minors on numerous occasions and had also spoken with Dr. Robert Clipper, who had been "counseling with the family, on several separate occasions." The GAL stated that she had also reviewed the case file, the minors' school records, and the "school comparisons" that the parties had provided. The GAL advised that she had visited the marital home, Y.S.'s apartment in Newburgh, Indiana, and B.L.'s prospective school in Newburgh. The GAL further advised that she had been electronically communicating with Q.L. and Y.S. throughout the pendency of the case. The GAL noted that the matters before the court were Y.S.'s relocation request and "an initial determination" with respect to the allocation of the parties' parenting time and decision-making responsibilities.

¶ 15    The GAL's report detailed the parties' history and generally summarized the information that she had gathered during the course of her investigation. The report cited and discussed each of the relevant factors that the court would be considering when ruling on Y.S.'s relocation request (750 ILCS 5/609.2 (West 2018)) and when allocating the parties' parenting time and decision-making responsibilities (*id.* §§ 602.5, 602.7). With respect to parenting time, the report noted that both parties wanted to be the minors' primary custodial parent and that Q.L. was objecting to Y.S.'s proposed relocation because

5

of the impact it might have on his time with the children. With respect to the parties' decision-making responsibilities, the report noted that the parties had both advised that they would agree to jointly make all major decisions regarding the minors. The report further noted that Q.L. wanted to reconcile the parties' marriage but that Y.S. was unwilling to do so.

¶ 16    The GAL ultimately recommended that Y.S. be awarded primary parenting time with the right to relocate the children to the Evansville area. Noting that both parties were high-quality parents, the GAL indicated that her recommendation had been a difficult one to make. The GAL recommended that Q.L. be awarded parenting time every other weekend during the school year, for "the bulk" of the children's holiday breaks, and for the majority of the summer. The GAL stated that she would be willing to assist in the finalization of a "more specific" parenting time schedule following the resolution of Y.S.'s request to relocate. The GAL noted that the parties "should be able to share in joint decision-making regardless of where the children are located."

¶ 17    On June 11, 2019, Q.L. filed a motion to substitute the GAL and strike her report and recommendation. The motion advised that the GAL was a member of the board of trustees of Southern Illinois University (SIU) and had been a member in April 2018, when Y.S. was awarded an intradepartmental promotion with SIUE's department of electrical and computer engineering, effective July 2018. The motion alleged that the GAL had a "supervisory role" over Y.S. and the authority to approve her promotion. The motion alleged that the GAL's professional affiliations with Y.S. and the GAL's participation in the parties' case created a conflict of interest that warranted the GAL's substitution and the

6

striking of her report and recommendation. The motion further alleged that the GAL should have recused herself in light of the conflict. The motion suggested that Q.L. had been unaware of the conflict until after the GAL had filed her report. The motion specifically asked the court to not consider the GAL's assertions or conclusions when determining whether to grant Y.S.'s request to relocate or when allocating the parties' parenting time.

¶ 18    On June 18, 2019, Y.S. filed a response to Q.L.'s motion to substitute the GAL and strike her report and recommendation. In her response, Y.S. asserted that Q.L. and his attorney were fully aware of the GAL's connections to SIUE and had specifically questioned the GAL regarding her relationship, "if any," with Y.S. Y.S. maintained that the GAL had advised the parties that she did not know Y.S. and that the GAL's position on SIU's board of trustees "would have no effect on her ability to render a fair and impartial decision regarding relocation of the minor children from Illinois to Indiana." Characterizing the motion to substitute and strike as frivolous, Y.S. contended that the timing of Q.L.'s objection to the GAL's participation in the case suggested that the motion was being lodged to "cause unnecessary delay in hopes of manipulating the outcome of the underlying relocation action."

¶ 19    On June 19, 2019, the cause proceeded to a hearing on Q.L.'s motion to substitute and strike. After restating the allegations set forth in the motion, Q.L. repeatedly argued that the GAL's "favoritism and partiality towards her former colleague" was apparent from the GAL's report and recommendation. Q.L. denied Y.S.'s suggestion that his motion to substitute and strike was being brought to delay the upcoming trial, and he indicated that

7

he had not begun investigating Y.S.'s "prior professional relationship" with the GAL until after receiving the GAL's report.

¶ 20    Y.S. advised the circuit court that the parties and their attorneys had all agreed that Sholar would be the children's GAL and that all were aware of the GAL's position on SIU's board of trustees. Y.S. explained that there had been specific discussions as to whether the GAL's involvement in the present case presented a potential conflict of interest, that it had been determined that the GAL's position on the board would not affect her ability to render an impartial decision, and that no one had objected to her appointment at the time. Y.S. further noted that SIUE employs thousands of people and that before being appointed in the present case, the GAL did not "even know who [Y.S.] was." Y.S. again suggested that Q.L.'s motion to substitute and strike was being filed because he did not approve of the GAL's recommendation and wanted to delay the proceedings and "manipulate the evidence."

¶ 21    The GAL confirmed that "everyone knew" she was on SIU's board of trustees when she was appointed in the present case. The GAL indicated that she and Y.S. had never been colleagues and that she would not have voted on Y.S.'s promotion because the board only voted on appointments and promotions with salary considerations greater than $150,000. The GAL further indicated that she was insulted by Q.L.'s suggestion that she was biased, explaining that she would have recused herself had she thought she could not be impartial. The GAL also questioned the timing of Q.L.'s motion, suggesting that it had been filed to prolong the case.

8

¶ 22    When questioned by the court, Q.L.'s attorney acknowledged that when the GAL was appointed, he had been aware that she was affiliated with SIU and that Y.S. worked at SIUE. The court subsequently denied Q.L.'s motion to substitute the GAL and strike her report and recommendation, noting that Q.L. could cross-examine her as to any potential bias at trial.

¶ 23    On June 27, 2019, Q.L. served Dr. Clipper with a subpoena seeking all records pertaining to B.L.'s counseling and treatment, "including, but not limited to copies of therapy sessions, treatment records, patient participation notes, doctor's notes, etc." On July 1, 2019, Y.S. moved to quash the subpoena on the grounds that it failed to comply with section 10(d) of the Illinois Mental Health and Developmental Disabilities Confidentiality Act (740 ILCS 110/10(d) (West 2018)).

¶ 24    On July 2, 2019, Q.L.'s co-counsel filed an entry of appearance, a motion to reconsider the denial of Q.L.'s motion to substitute the GAL and strike her report and recommendation, and a motion to continue the upcoming trial. In the motion to reconsider, Q.L. maintained, *inter alia*, that although the GAL might not have acted under "an actual conflict" of interest, her participation in the case created an appearance of impropriety that warranted her disqualification.

¶ 25    On July 3, 2019, Q.L. filed a motion seeking the authorization of a subpoena compelling the release of Clipper's records pertaining to B.L. The motion advised that in response to Q.L.'s request for copies of the records, Clipper had only provided "a narrative summary regarding the minor child's treatment." Q.L. asserted that he needed copies of

9

the records to prepare for trial, and he requested that the circuit court set the matter for a hearing.

¶ 26 On July 5, 2019, the circuit court entered an order granting Y.S.'s motion to quash Q.L.'s request to subpoena Clipper's records, agreeing that Q.L. had failed to comply with the applicable statutory requirements. See 740 ILCS 110/10(d) (West 2018). On July 9, 2019, the court entered orders denying Q.L.'s motion to continue the trial, Q.L.'s motion to reconsider the denial of his motion to substitute and strike, and Q.L.'s motion seeking the authorization of a subpoena compelling the release of Clipper's records.

¶ 27 On July 11, 2019, Y.S. filed her position paper in support of her contentions that it would be in the minors' best interests that she be designated their primary residential parent and that she be allowed to relocate them to Indiana. Y.S. indicated that she would be willing to provide all transportation necessary to accommodate Q.L.'s resulting parenting time, suggesting, *inter alia*, that he be given at least six weeks of parenting time every summer.

¶ 28 On July 12, 2019, Q.L. filed his position paper in support of his claim that Y.S.'s proposed location "would have a terrible impact on the mental health, sense of belonging, identity, and development of both children." Noting that he had been the minors' "primary residential parent" since August 2018 and that his parents were actively involved in the minors' lives, Q.L. argued that the parties' existing parenting time arrangement should continue because the children had grown accustomed to it and because the court would be unable to fashion a reasonable allocation of parenting time if Y.S.'s relocation petition were granted.

¶ 29    On July 18, 2019, Q.L. filed a motion *in limine* requesting that the circuit court either strike the GAL's report or compel Clipper to tender his records pertaining to B.L.'s treatment. The motion suggested, *inter alia*, that because the GAL had relied on information obtained from Clipper when preparing her report, Q.L. could not adequately cross-examine the GAL about her report without the records. The motion alleged that Clipper had "patently refused to allow [Q.L.] access to these records." The motion further intimated that Clipper might have acted as a "silent GAL," who "performed an assessment that the GAL [was] not trained to do" and thus acted as "an unappointed expert witness."

¶ 30    On July 19, 2019, and August 15, 2019, the cause proceeded to a two-day trial, during which Y.S. testified on her own behalf and called no other witnesses. Q.L. testified on his own behalf, called the GAL and Clipper as witnesses, and called Y.S. as an adverse witness. On the first day of the trial, Y.S. and Clipper testified. On the second day, Y.S., Q.L., and the GAL testified. At the time of trial, B.L. was 10 and J.L. was 4.

¶ 31    At the outset of the trial, the circuit court announced, "[W]e're here today on [Y.S.'s] motion—Petition to Relocate." When Q.L.'s motion *in limine* was addressed, Q.L. apologized for the late filing of the motion but explained that the preparation of his position paper had taken precedence. After noting that he had previously attempted to obtain copies of Clipper's records, Q.L. emphasized that the GAL had repeatedly referenced Clipper when reporting her observations regarding the statutory factors relevant to Y.S.'s request to relocate and the allocation of the parties' parenting time. Q.L. maintained that without the requested records, he was not prepared to cross-examine Clipper. Q.L. also argued that

11

Clipper should not have been permitted to speak with the GAL without Q.L.'s express consent.

¶ 32    In response, Y.S. noted that although Q.L. had failed to properly request copies of Clipper's records, Q.L. had listed Clipper as a witness and could therefore question him about the records "in open court." Y.S. further suggested that because the GAL had "a duty to speak with the counselor," it was not surprising that the GAL's report referenced her conversations with Clipper.

¶ 33    The GAL stated that her communications with Clipper had consisted of telephone conversations during which they had discussed matters such as their impressions of the parties, the adjustment of the children, and the progress of the parties' case. The GAL advised that she and Clipper had never discussed recommendations because making recommendations "was not really his function in this case." The GAL further advised that she had never seen any of the requested records.

¶ 34    When denying Q.L.'s motion *in limine*, the circuit court noted that Q.L. had attempted to obtain Clipper's records without an order from the court, that Clipper had provided Q.L. with a summary report of B.L.'s treatment, and that whatever questions remained about the records in question could be answered when Clipper testified.

¶ 35    Thereafter, Y.S. testified that she had a Ph.D. in electrical engineering and had been employed as the dean of the college of engineering and computer science at the University of Evansville since August 1, 2018. She noted that she was the first female engineering dean in the college's 100-year history. Y.S. explained that when she was offered the position, she considered refusing it in light of her pending divorce but then decided that it

12

was an opportunity that she should pursue. She further explained that taking the job resulted in a significant salary increase and better benefits. Y.S. indicated that she anticipated working at the university for 20 years. Y.S. testified that she had previously taught at SIUE for 11 years.

¶ 36　Y.S. testified that she was currently renting an apartment in Newburgh, Indiana, but was building a house in Newburgh that she anticipated would be completed by October or November 2019. Y.S. testified that Newburgh was a suburb of Evansville with schools comparable to those of Edwardsville. Y.S. testified that it took 2½ hours to drive from Evansville to Glen Carbon.

¶ 37　Y.S. indicated that the parties' marital problems began after B.L.'s birth in 2009, when Q.L. became aggressive, demanding, and controlling. Y.S. testified that in 2010, when she confronted Q.L. about his behavior and suggested that they see a marriage counselor, he denied that there were any issues to resolve. Y.S. testified that she stopped wearing her wedding ring at that point and "was really on the edge of filing for divorce then." She explained, however, that she decided to wait until Q.L. attained permanent residency status, which she had already obtained through SIUE. Y.S. testified that she had also thought that it was in B.L.'s best interests that the parties remain married at the time. Y.S. testified that she had also been reticent to dissolve the marriage because divorces were unacceptable in traditional Chinese culture, and she knew that her parents would not approve of her decision. Y.S. testified that "to this day," her parents still did not approve of her decision. When cross-examined, Y.S. acknowledged that she certainly had feelings of "shame" and "guilt" with respect to the divorce.

13

¶ 38    Y.S. indicated that the parties' relationship further deteriorated in 2016, when Q.L.'s parents decided to leave China and move in next door. Y.S. explained that her relationship with her mother-in-law had never been "great" but she understood that as an only child, Q.L. was culturally obligated to take care of his parents as they aged. Y.S. indicated that Q.L.'s parents were often very helpful, but over time, they began "interfering" and pressuring her with respect to how she was raising the minors, how she cleaned her house, and how she generally conducted herself as a wife. Y.S. explained that in the traditional Chinese culture that she and Q.L. were accustomed to, women were expected to be obedient, supportive housewives as opposed to career professionals. Y.S. also believed that Q.L. and his parents preferred J.L. over B.L. because J.L. was a boy. Y.S. opined that the presence of Q.L.'s parents in the children's lives had been "more positive than negative" with respect to J.L. but had been "more negative than positive" with respect to B.L. Y.S. testified that she had not spoken to Q.L.'s parents in over two years.

¶ 39    Y.S. testified that in September 2017, she had mentioned to Q.L. that she might be interested in obtaining a dean of engineering position. In response, he told her that she did not have enough experience and was not ready to be a dean. Y.S. testified that she decided to "try anyway."

¶ 40    Y.S. testified that on October 21, 2017, Q.L.'s mother told her that they needed to have a "family meeting." While Q.L.'s father watched the minors, Q.L. and his mother admonished Y.S. as to how she should be raising the minors and conducting herself as a housewife in accordance with Chinese tradition. Y.S. testified that when she challenged their notions and suggested that she should perhaps "quit [her] job" as a wife and daughter-

14

in-law, Q.L.'s mother stated that she did not want Y.S. to divorce Q.L., she just wanted Y.S. to "improve" herself. Y.S. indicated that she ultimately believed that living next door to Q.L.'s parents was damaging her mental health.

¶ 41    Y.S. testified that on October 22, 2017, she told Q.L. that she wanted to dissolve their marriage. In response, Q.L. told her that she could leave at any time so long as the children stayed with him. When Y.S. advised Q.L. that a judge would determine what would happen with the children, Q.L. got irritated, threatened to kill her, put his hands around her neck, and choked her. Y.S. testified that Q.L. stopped when B.L., who had been listening to the argument, ran into the room. The parties promptly comforted B.L., and Q.L. assured her that he was not going to kill Y.S. Y.S. indicated that for two weeks thereafter, B.L. had asked her if Q.L. was "really going to kill" Y.S.

¶ 42    On October 31, 2017, Y.S. filed her petition for dissolution and subsequently obtained an order of protection against Q.L. Y.S. testified that she might not have had "enough courage to file for divorce" had B.L. not witnessed the choking incident. Y.S. explained that she did not want B.L. to believe that a man could "touch her without permission that way."

¶ 43    Y.S. testified that when she obtained her position at the University of Evansville after the parties' separation, Q.L. told her that she was "just lucky" and had received special treatment because she was a woman. Y.S. indicated that Q.L. had been very supportive of her efforts her while they were classmates at Notre Dame, but eventually, he "started to undermine [her] ability and successes." Y.S. further indicated that Q.L. had suggested that she consider giving up her career for the sake of the children.

¶ 44    Y.S. acknowledged that in addition to advancing her career, "having some distance" between her and Q.L.'s parents played a "very big role" in her decision to accept her position at the University of Evansville. Y.S. further explained that she viewed her move to Indiana as a chance to reestablish herself in a new area where no one was aware of the problems she and Q.L. had been experiencing.

¶ 45    Y.S. testified that while living in Glen Carbon, she had taken B.L. to all of B.L.'s drum, ukulele, drawing, and ice-skating classes. Y.S. did not believe that Q.L. had been very involved in B.L.'s extracurricular activities, but she acknowledged that he had sometimes taken J.L. to J.L.'s karate lessons.

¶ 46    Y.S. testified that in October 2018, she made a mid-week trip to Glen Carbon to carve pumpkins with the children and take them trick-or-treating. Y.S. stated that Q.L. had not participated in either activity and that he commonly did not participate in such activities with the children.

¶ 47    Y.S. indicated that Q.L.'s parenting style was "really strict" and that hers was "more lenient." Explaining that their parenting styles often conflicted, she acknowledged that when Q.L. became overly strict with the children, she generally reacted by being overly lax with them. Y.S. testified that Q.L. was "a very academically driven person" and had very high expectations for B.L. Y.S. stated that Q.L. wanted B.L. to attend an Ivy League university or the University of Notre Dame. Y.S. explained that if B.L. did not get the highest possible grades on her report cards, there were consequences. Y.S. indicated that Q.L. often yelled at B.L. while helping her with her homework. Y.S. suggested that Q.L.'s teaching methods were potentially undermining B.L.'s confidence. Y.S. admitted that she

16

was less concerned about grades and wanted to give B.L. "the freedom to be who she is without putting too much pressure on her." Y.S. testified that she did not expect the children to attend Ivy League schools, and she opined that graduating from a prestigious university was not "the only way to be successful."

¶ 48    Y.S. opined that B.L. had been experiencing separation issues due to Y.S.'s removal from her daughter's day-to-day life. Y.S. indicated that when she visits the children on the weekends, B.L. unleashes a "volcano of all the emotions" that she had to suppress during the week. Y.S. further indicated that she wanted to be a positive role model for B.L. and did not want either of her children to believe that a Chinese woman's value lies in her willingness to be a "stay-at-home mom." Y.S. acknowledged that J.L. tended to "look up" to Q.L. more than her. Y.S. further acknowledged that the children were well adjusted to the Edwardsville area.

¶ 49    Y.S. testified that prior to moving to Indiana, she had been the children's primary caregiver. Y.S. indicated that before and after moving to Indiana, she had been primarily responsible for taking the children to their doctor and dentist appointments. She further indicated that her present work schedule was very flexible and that she would be able to transport the children to and from their schools each day. Y.S. testified that the Evansville area would provide the children numerous opportunities to participate in various activities. Y.S. indicated that Q.L.'s daily commute and schedule would limit or preclude the children from participating in extracurricular activities during the workweek. Y.S. explained that neither of Q.L.'s parents drive or speak English.

17

¶ 50    Y.S. testified that she had an established network of friends and contacts in Newburgh and had recently joined the board of directors for the Girl Scouts in Evansville. Y.S. opined that the minors would have no problems assimilating into the community and schools. Y.S. further testified that if the children were allowed to relocate, her parents would likely visit from China and assist in the transition. Y.S. stated that her parents had previously traveled to Glen Carbon to visit the children, that she had previously taken the children to China to visit her parents, and that her parents and the children had a good relationship.

¶ 51    Y.S. opined that allowing B.L. and J.L. to relocate to Indiana to live with her would be in the children's best interests and would have a positive impact on their lives. She believed that she would be a better caregiver than Q.L. because she had closer emotional bonds with the children and had "a better temperament to educate them." Y.S. suggested that the children "could decide on their own which parent they want to be with when they're older." Y.S. testified that she believed that the children would generally "do better" living in Indiana with her. Y.S. acknowledged that in her discovery interrogatories, she had stated that young children should not be separated from their mothers.

¶ 52    Y.S. testified that if the minors were not allowed to relocate to Indiana, her primary concern would be that Q.L.'s strict parenting style might preclude B.L. from being able to "express herself without feeling pressure." Y.S. was also concerned that Q.L. might limit or interfere with her parenting time. Additionally, in light of several of the comments that Q.L. had already made to the children, Y.S. did not believe that he would facilitate the children's relationship with her. Y.S. disagreed with Q.L.'s apparent belief that a

18

dissolution necessarily entails "choosing between two parents and one parent." Y.S. suspected that Q.L. had been attempting to influence B.L.'s views about the parties' divorce.

¶ 53    Y.S. testified that since moving to Indiana, she had been seeing the minors every weekend at the parties' marital home in Glen Carbon. Y.S. indicated that she and Q.L. had basically been living together on the weekends and that he had refused her requests that he give her and the children time alone. She further indicated that Q.L. often used the visits as opportunities to discuss the parties' separation in front of the children. Y.S. suggested that a divorce is a particularly unfortunate situation when children are involved and that it is best to "keep the divorce discussions" between the adults.

¶ 54    Y.S. testified that the children had visited her in Newburgh over their spring break, but Q.L. had not met her in Mt. Vernon for the attendant custody exchanges. Y.S. testified that the children liked her apartment and had a good time during the visit. Y.S. testified that Q.L. had told the children that he would not visit them in Indiana if they moved there with Y.S.

¶ 55    Y.S. testified that she had not told Q.L. that she was building a house in Newburgh, but his attorney had advised him that she was doing so. Y.S. indicated that during a visitation weekend at the marital home in April 2019, Q.L. had confronted her about her decision to "settle down in Indiana." When Y.S. started to leave to avoid an argument, Q.L. took her keys and wallet. Y.S. testified that in response, she exited the house and walked around the subdivision for several hours. When she returned, Q.L. returned her keys and

19

wallet, and she drove back to Newburgh at 2 a.m. Y.S. described Q.L.'s conduct during the incident as "pretty typical of his behavior."

¶ 56    Y.S. testified that three nights before the commencement of the trial, she was on a business trip in Cape Girardeau, Missouri, and Q.L. unexpectedly showed up at her hotel room with the children. Y.S. testified that Q.L. had tried to convince her "to stay married for the sake of the children." Y.S. explained that Q.L. had the children vote as to whether they wanted to have two parents or one parent, and when they both voted "both parents," Q.L. advised her that she had lost the vote and should thus return home and remain married. Y.S. indicated that she did not relent and that the following morning Q.L. angrily left without the children, saying "I give up." He then told her that she could have the kids and the house and that they would never see him again. Y.S. indicated that she had to take the children to a business meeting that morning, where J.L. stated in front of her colleagues that his dad was "gone forever." Y.S. testified that B.L. had since been asking if Q.L. was really "going to leave forever." Y.S. testified that she had assured B.L. that "daddy is just mad, and he will come around." Y.S. testified that B.L. had later told her that on the way to Cape Girardeau, Q.L. had told the minors that "the mission was to convince mommy to return home."

¶ 57    Y.S. testified that the night before the commencement of the trial, Q.L. told the children that the parties were going to court "to fight," that Y.S. had been lying to them, and that "she's not coming back." Y.S. further testified that on the morning of the commencement of the trial, Q.L. told her not to "play victim" and referred to her as a selfish, "cold-hearted person" who was not "putting the children first."

20

¶ 58   Y.S. testified that Q.L. was "a really good person when he's not angry" and that she did not believe that he would ever physically harm either of the children. Y.S. testified that Q.L. had recently advised her that he had not yelled at B.L. in several months. Y.S. indicated that she highly respected Q.L. as a father and a scientist.

¶ 59   Y.S. testified that she did not relocate to Indiana to frustrate Q.L.'s relationships with the minors. Y.S. testified that the children loved Q.L. and that she wanted him to be involved in the children's lives. Y.S. indicated that she was willing to communicate with Q.L. so that they could effectively discuss all significant decisions regarding the children's education, activities, and medical needs. Y.S. indicated that religion would not be an issue. Y.S. suggested that the parties' parental responsibilities be jointly held.

¶ 60   Y.S. testified that she would encourage the children's relationship with their father. Y.S. testified that she wanted Q.L. to have a reasonable amount of parenting time so that he could see the children on a regular basis. Y.S. testified that she was willing to drive the children to and from Glen Carbon for parenting time with Q.L. if necessary. Y.S. stated that if Q.L. wanted to drive to Indiana to visit the children, he could do so at any time and could stay at her house. Y.S. testified that she was also willing to give Q.L. extended parenting time over the children's holiday and summer breaks. Y.S. testified that if she had to take a business trip, she would give him the right of first refusal to care for the minors in her absence.

¶ 61   Clipper testified that he was a licensed family and marriage counselor with a Ph.D. in counseling and marriage therapy and had been performing clinical evaluations and counseling services since the 1980s. Clipper acknowledged that he was not a psychiatrist

21

and that his opinions were based on his experience and training. Clipper testified that he received client referrals from several GALs, including Sholar. Clipper indicated that he received approximately 25 GAL referrals per year. Clipper further indicated that the type of counseling that he provided in a particular case depended on the persons and issues involved.

¶ 62    Clipper testified that in the present case, the GAL had asked him to counsel B.L. because the child was seemingly experiencing difficulties dealing with the parties' separation and Y.S.'s move to Indiana. Clipper had not been asked to evaluate B.L.'s family with regard to any custody issues, and it was never his intent to do so. Clipper indicated that while counseling B.L., he had met with her by herself, had met with her and Y.S., had met with her and Q.L., had met with her and the parties together, and had met with the parties individually.

¶ 63    Clipper acknowledged that he was aware that his impressions of B.L.'s situation would potentially be relevant in the present case. Clipper further acknowledged that his role in the present case had not been to evaluate the parties' parenting abilities. Clipper testified that he believed that Q.L. knew that B.L.'s counseling would result in communications with the GAL.

¶ 64    When presented with the GAL's report to the court, Clipper was confronted with the portions that referenced his communications with the GAL and his statements and opinions regarding the parties' case. Clipper acknowledged that information he provided had thus been used in her evaluation of the parties' parental abilities. Clipper explained that he viewed his communications with the GAL as "comparing" and "contrasting" their

22

impressions, but he acknowledged his awareness that anything he said to her had the potential to influence her views.

¶ 65    Clipper testified that he and the GAL had briefly spoken about the parties' case over the telephone on three separate occasions. Clipper indicated that during each conversation, he had generally apprised her as to how B.L. and the parties were functioning and progressing. Clipper indicated that he believed that he was authorized to freely discuss the case with the GAL because she had instructed the parties to consult him and neither were existing clients. Clipper further indicated that assessing B.L.'s situation required him to assess the parties' situation as well.

¶ 66    Clipper testified that although he viewed B.L. as the client he was counseling, he had also had "a therapeutic relationship with the family because they were participating." When asked whether Q.L. had given him permission to discuss the therapeutic relationship with the GAL, Clipper stated that Q.L. understood that "they were there because of the GAL." Clipper further stated that he believed that Y.S. and Q.L. both understood that he would be sharing information with the GAL. Clipper indicated that although he "made it clear" that such was the case, in retrospect, he should have had them sign an appropriate release.

¶ 67    Clipper acknowledged that when Q.L. requested and signed a release for the records memorializing B.L.'s therapeutic sessions, he responded by providing Q.L. with a summary of the records. Clipper explained that as a matter of policy, he does not give records out to "individuals" and only provides summaries. Clipper further explained that he will only provide copies of his records to the circuit court when ordered to do so. Clipper

23

indicated that he would have allowed Q.L. to review the records with him at his office, however, had Q.L. made such a request.

¶ 68 When asked what discussions he and the GAL had with respect to Q.L., Clipper testified that they had discussed matters such as the parties' interactions with B.L. and the parties' personalities and parenting styles. Clipper testified that they had not discussed matters such as which parent should have more time with the children or what would be in the children's best interests. They had, however, discussed "how the parents interacted and how they would support each other's role as parents." Clipper testified that he made no recommendations to the GAL and that they never discussed her report. Clipper also noted that the GAL was capable of forming her own opinions.

¶ 69 Clipper acknowledged that many of his beliefs that were cited in the GAL's report were relevant with respect to the statutory factors that a court must consider when determining the best interests of a child. Clipper explained, however, that he did not perceive that by expressing his personal opinions to the GAL, he was necessarily evaluating the factors for the court's consideration. With respect to his cited belief regarding Y.S.'s willingness to facilitate a relationship with Q.L., for instance, Clipper explained, "[T]he question might have been do you think mom can support dad and the relationship, and I said yes."

¶ 70 At the conclusion of Clipper's testimony, Q.L. moved to strike Clipper's testimony "both in court here today as well as in the [GAL's] report." Q.L. argued that striking Clipper's testimony was warranted because Clipper had not been disclosed as an expert

24

witness. Q.L. further maintained that he had called Clipper as a witness "out of necessity" because Clipper's opinions had been relied on to analyze the relevant statutory factors.

¶ 71    In response, the GAL observed that it was odd that Q.L. was moving to strike the testimony of a witness who he, himself, had called. Maintaining that the court could properly consider her entire report, the GAL noted that Q.L. could question her about its contents when he called her to the stand.

¶ 72    The circuit court denied Q.L.'s motion to strike Clipper's testimony, noting that Clipper had not been tasked with evaluating the statutory factors. The court further noted that it had previously denied Q.L.'s request that the GAL's report be stricken.

¶ 73    The GAL subsequently cross-examined Clipper and questioned him as to the specific discussions they had about the parties' case. Clipper again indicated that when they discussed the parties, the conversations generally focused on the parties' personalities and parenting styles. Clipper recalled advising the GAL that the parties were effectively coparenting and that B.L. was doing well living with her father. Clipper further recalled advising the GAL that the parties were "essentially making the best of a bad situation." Clipper reiterated that he was aware that their discussions could potentially be included in her report and that he had offered her no recommendations.

¶ 74    When the trial resumed on August 15, 2019, the circuit court stated, "[W]e are back on the record for a Petition for Relocation." Y.S. then testified on her own behalf, describing events that had occurred since July 19, 2019. Y.S. testified that on the morning of August 5, 2019, as she was leaving the marital home to drive back to Indiana, Q.L. had tried to convince her to dismiss the divorce, return to Glen Carbon, and "start over." Y.S.

25

stated that when she declined the offer, Q.L. responded by screaming that he was going to "take the kids and drive to the river." He then physically blocked the front door to prevent Y.S. from leaving. The argument woke B.L. up, and she ended up dragging Q.L. away from the door so that Y.S. could leave the house.

¶ 75 Y.S. testified that a few hours later, Q.L. called her stating that he was going to "give up the fight" and that she could have the kids. A few hours after that, Q.L. dropped the minors off at Y.S.'s apartment in Newburgh and left.

¶ 76 Y.S. testified that the following night, Q.L. returned to Newburgh and advised her that he had changed his mind and wanted to take the children back to Glen Carbon. Y.S. indicated that the children had not wanted to go with him.

¶ 77 When cross-examined about the recent events, Y.S. acknowledged that she had not been concerned about the children's safety even though Q.L. had indicated that he would drive them into a river. Y.S. explained that "he just said those things."

¶ 78 When subsequently questioned as an adverse witness, Y.S. was asked why her petition to relocate the minors did not reference the October 22, 2017, domestic violence incident. In response, Y.S. explained that the incident had been the basis for her dissolution petition but that her new job in Evansville had been the basis for her petition to relocate.

¶ 79 When asked what her proposed parenting time schedule would be in the event that her request to relocate the minors were granted, Y.S. indicated that she would be willing to drive the children to and from Glen Carbon two weekends per month and that Q.L. could visit them in Newburgh whenever he wanted. Y.S. further indicated that she would be willing to drive the children to and from Glen Carbon every weekend if necessary.

¶ 80    Q.L. testified that he was employed as a research and development scientist, that he resided at the marital home with the parties' children, and that his parents lived next door. Q.L. indicated that having his parents nearby was convenient and beneficial to him and the children.

¶ 81    Q.L. stated that B.L. took the school bus to and from school and that his parents fed her dinner when she returned home. Q.L. testified that he took J.L. to and from preschool on his way to and from work and that they ate dinner together when they returned home. Q.L. indicated that the children had an established routine that worked well.

¶ 82    Q.L. acknowledged that he was strict with B.L. with respect to her homework and that as a matter of Chinese tradition, perfect grades were expected. Q.L. explained that he wanted B.L. to excel academically so that she could someday attend an elite college if she wanted to do so. Q.L. testified that he had enrolled B.L. in a karate class to boost her confidence, but she decided to "give up on that."

¶ 83    Q.L. testified that the parties' financial situation was solid and that Y.S. did not need to change jobs for monetary reasons. Q.L. testified that he was not an aggressive person and that Y.S. knew that he would never hurt her. Q.L. testified that he had completed a 26-week partner abuse intervention program following the October 22, 2017, incident at the marital home.

¶ 84    Q.L. suggested that Y.S. did not have an established support group in the Evansville area and that her new job would require her to frequently travel. Q.L. noted that Edwardsville's Chinese-American community was larger than Evansville's, that B.L. and

27

J.L. both spoke fluent Chinese, and that B.L. had many Chinese friends. Q.L. further noted that the Indiana branch of the KKK had been founded in Evansville.

¶ 85   Over Y.S.'s relevancy objections, Q.L. testified that in October 2016, he and his family had been discriminated against on the basis of their race while visiting an amusement park in southern Indiana. Q.L. indicated that he and his family did not like drinking tap water and that based on Chinese tradition, they only drank warm water. When they attempted to bring their own warm water into the amusement park, they were told that there were no outside beverages allowed. When the circuit court suggested that the park's outside-beverage restriction likely applied to everyone who entered the park, Q.L. indicated that he believed that he had been discriminated against because "[w]ater is not a beverage."

¶ 86   Q.L. testified that he objected to Y.S.'s relocation petition because the children were well adjusted to their present environment and would be slow to adjust to a new one. He further objected because both minors, especially B.L., wanted to see both parties frequently.

¶ 87   Q.L. testified that J.L. had recently been acting aggressively towards him. Q.L. suggested that J.L.'s behavior was attributable to Y.S.'s tendency to spoil the child with candy and toys. Q.L. testified that during B.L.'s counseling sessions, he never considered himself to be Clipper's patient and that the sessions were solely intended to help B.L. with her separation issues.

¶ 88   Q.L. testified that he wanted the children to remain in Glen Carbon and wanted the parties' present parenting time schedule to continue. Q.L. estimated that if Y.S. continued

28

visiting the children at the marital home every weekend, with spring break and additional time in the summer, she would be able to see the children "probably half of the year." Q.L. testified that his relationship with the children would degrade under Y.S.'s proposed allocation. Q.L. testified that Y.S. could visit the children and stay at the marital home whenever she wanted. Q.L. testified that he was willing to facilitate a relationship between the children and Y.S. Q.L. testified that he would drive to Indiana to visit the children if he had to, but he "definitely" did not want to. Q.L. acknowledged that other than the times that he had driven to Newburgh on August 5 and 6, Y.S. had "done all the driving" back and forth from Indiana. Q.L. indicated that he would be willing to meet in Mt. Vernon for weekend custody exchanges if ordered to do so.

¶ 89    When Q.L. subsequently called the GAL as a witness, the circuit court, having previously advised the parties that it had another trial scheduled in the afternoon, admonished him to "restrict the questions" to matters that were relevant.

¶ 90    The GAL subsequently testified that she had been present during both days of the trial and that the parties' testimony had reinforced her reported recommendation. When counsel commenced questioning the GAL with respect to her position on SIU's board of trustees, Y.S. objected, and the circuit court reminded counsel that the issue had already been explored. The court indicated it would allow Q.L. some leeway to explore the GAL's possible bias, but it was not going to allow his attorney to relitigate the motion to substitute the GAL and strike her report.

¶ 91    Again, acknowledging that she had been on the board of trustees when she was appointed in the present case, the GAL testified that she did not know who Y.S. was before

29

being appointed. The GAL explained that she first learned that Y.S. worked for SIUE during their initial interview, when Y.S. stated that she was leaving her job at SIUE and taking a new job in Evansville.

¶ 92    When asked if she was involved in any other civic organizations, the GAL indicated that she did charity work and served on a local community development board. When the GAL was asked what kind of charity work she did, the circuit court interjected and explained that it was not going to allow counsel to "fish for bias" as if the hearing were a deposition. The court noted that Q.L. could have deposed the GAL prior to trial but apparently chose not to do so. As an offer of proof, counsel subsequently represented that counsel had reason to believe that the GAL had recently been involved "in a civic organization devoted to the enhancement of women in the law and women professionals in general." Suggesting that making an offer of proof on the matter was "ridiculous," the court directed counsel to ask the GAL a direct question. Counsel subsequently asked the GAL if she was a member of the "Madison County Women's Bar Association." In response, the GAL indicated that she was on the "e-mail chain" of a group of women from the Madison County Bar Association that periodically met for lunch. The GAL further indicated that she might have gone to one of the luncheons six or seven years ago.

¶ 93    Thereafter, the GAL testified as to how she generally interacted with the parties in a custody dispute and how she specifically interacted with the parties in the present case. The GAL was asked numerous questions about her interactions and impressions of B.L. and J.L. The GAL testified that Y.S. and B.L. had both been suffering from apparent anxiety. The GAL recommended that B.L. see Clipper and that Y.S. "reach out for her own

30

individual counseling." The GAL stated that she had referred B.L. to Clipper because he was "well accustomed with the courts and divorce" and was actively involved in numerous Madison County cases. The GAL acknowledged that she had worked with Clipper on prior occasions and trusted his judgment. The GAL indicated that she worked with several counselors and did not recall insisting that the parties use Clipper.

¶ 94 The GAL indicated that she had been serving as a GAL for 16 years and was generally appointed in cases that had become difficult and challenging for the family members involved. She explained that as a result, she referred many children to therapy. The GAL further explained that a referral for the counseling of a couple's children will often result in counseling for the couple. The GAL indicated that when she works with families, she asks that they sign releases with any counselors she refers them to so that she can communicate with the counselors. The GAL indicated that the manner in which the releases were obtained was "entirely up to the counselor." The GAL acknowledged that she and Clipper had discussed the present case and that she received a copy of the counseling summary that Q.L. had obtained.

¶ 95 The GAL explained that she made her own recommendations in the cases that she worked and that she generally viewed Clipper as "just another set of eyes." The GAL further explained that Clipper only gave recommendations when he was appointed to act as a custody evaluator. When asked whether Clipper's opinions had affected any of hers, the GAL indicated that she "would have likely" arrived at the same conclusions without his opinions but that she was always interested in hearing from "third-party, independent sources." The GAL extensively testified regarding many of the matters upon which she

31

and Clipper had agreed. The GAL recalled that Clipper had referred to the parties' as "two great parents" and had referred to their situation as a "sad case."

¶ 96    While discussing other information that she had obtained during her investigation, the GAL testified that she had visited Y.S.'s apartment in Newburgh in May 2019. The GAL explained that housing was not a concern, and she was extensively questioned about her visit to Newburgh. In response, the GAL testified, *inter alia*, that the visit had been preapproved by the parties and that she had toured the schools the minors would attend if they moved. The GAL acknowledged that when she went to Indiana the month before she filed her report, she was "already leaning towards recommending" that Y.S.'s request to relocate be granted.

¶ 97    The GAL explained that while she believed that J.L. could readily adapt to any set of circumstances, B.L. and Y.S. were very close, and B.L. would ultimately suffer if she and Y.S. were separated. The GAL acknowledged that Clipper had indicated that B.L. "was adjusting fairly well to mom being away." The GAL further acknowledged that B.L. had become more independent since Y.S. had moved to Indiana. The GAL was aware that Q.L. did not want to dissolve the parties' marriage.

¶ 98    The GAL testified as to various facts and factors that she considered when forming her opinions, and she acknowledged that cultural issues played a part in the present case. The GAL indicated that she was not qualified to state whether "the traditional Chinese culture is a little closed and prefers to be among other Chinese." The GAL acknowledged that Q.L.'s broken English was sometimes hard to understand, but she denied the suggestion that it may have affected her judgment. The GAL acknowledged that although

she had visited the marital home in Glen Carbon, she had not spoken with any of the children's friends and had not obtained the services of a translator so that she could speak with Q.L.'s parents. She noted, however, that it was undisputed that while Q.L.'s parents were actively involved in the children's lives, his parents' relationship with Y.S. was "very strained." The GAL further noted that Q.L.'s parents were an asset to the children and helped him attend to the children's needs during the week.

¶ 99 The GAL testified that Y.S. had reported that she would not have to extensively travel for her job but would have to occasionally attend events at the university. Y.S. explained that the university had a nanny service available if she needed it. The GAL testified that she hoped that Y.S. would have Q.L. watch the children when she traveled. When asked if Q.L. had watched the kids during Y.S.'s recent business trips, the GAL testified that since the minors were living with Q.L., she assumed that such was the case. When counsel asked whether the GAL's custody recommendation would change were she to ever learn that Y.S. "had somebody other than the dad watch the kids because of a work commitment," Y.S. objected, noting that the question called for speculation. The circuit court sustained the objection and denied counsel's request to make an offer of proof on the matter. When the GAL was subsequently asked whether there was any evidence that could have been offered that would have changed her recommendation, Y.S. objected, noting that that question likewise called for speculation. The court again sustained Y.S.'s objection and denied counsel's request to make an offer of proof on the matter.

¶ 100 The GAL testified that both parties could adequately parent the children alone. The GAL testified that both parties were actively involved in the minors' lives and that both

33

children were well bonded with both parents. The GAL indicated that when the parties' efforts and parenting styles were combined and considered together, the parties did "a great job covering all the needs" of the children. The GAL noted that both parties were highly educated and that the minors were extremely intelligent. The GAL explained that since the parties' separation, however, acting as "a complete unit" had become more difficult. The GAL noted that Y.S. had been driving to and from Glen Carbon every weekend to visit the minors since she moved to Indiana.

¶ 101  The GAL testified that one of her primary concerns in the present case was the potential impact the proposed relocation might have on Q.L.'s parenting time. The GAL explained that she wanted Q.L. to be involved in the minors' lives as much as possible. The GAL testified that Y.S. was willing to facilitate a reasonable visitation arrangement but that Q.L. had repeatedly advised that he did not want to drive to see the children. The GAL opined that Q.L.'s recent behavior had further indicated that he could not "facilitate a relationship in the way that mom can." The GAL noted that Y.S. was willing to drive the children to and from Glen Carbon two weekends a month and that she was willing to allow Q.L. to visit the children in Indiana whenever he wanted. The GAL suggested that a three-weekend per month visitation schedule at the marital home could likely be negotiated. The GAL recommended that Q.L. also be given the majority of the summertime so that he and his parents would have extended periods of visitation with the minors.

¶ 102 The GAL testified that relocation cases are never easy and that her recommendations in such cases are never made "lightly." The GAL acknowledged that contentious situations can lead to "irrational behavior at times." The GAL explained that

although her recommendation that Y.S. be allowed to relocate the children had been very difficult to make when she prepared her report, it was "less difficult" for her to make the same recommendation after hearing the parties' testimony. The GAL testified that she had tried not to consider the parties' marital disagreements when preparing her report but that Q.L.'s recent behavior suggested that he viewed their custody dispute as "a control issue." Emphasizing that her role was to represent the minors' best interests, the GAL further noted that Q.L.'s recent behavior had likely confused the children. The GAL opined that the children would "be better suited residing with mom." The GAL reiterated her recommendation that the children be allowed to relocate to Indiana with Y.S. and that Q.L. be allocated as much parenting time as possible.

¶ 103   At the conclusion of the hearing, recognizing that the school year was commencing, the circuit court announced that it was granting Y.S.'s petition to relocate the minors to Indiana. The court stated that it was a "very tough decision" to make but that it was in the minors' best interests that Y.S.'s home be their "primary residence." The court awarded Q.L. parenting time at the marital residence every weekend pending the entry of an order establishing a permanent parenting time schedule and directed that the parties' custody exchanges occur in Mt. Vernon.

¶ 104   A few hours later, Q.L. filed a 16-page motion asking the circuit court to either reconsider its ruling or vacate its judgment. The motion argued, *inter alia*, that the court erred in not compelling Clipper to produce his records and that Clipper's testimony "tainted the entire trial process." Q.L. maintained, *inter alia*, that Clipper had testified as an expert witness without being disclosed as such, that Clipper's communications with the GAL were

35

unauthorized, and that although it was "unclear" what information Clipper had relayed to the GAL, Clipper had violated Q.L.'s "confidentiality rights."

¶ 105  On September 12, 2019, Q.L. filed a motion for an extension of time to file an amended motion to reconsider or vacate, asserting various reasons why an extension was necessary. On September 16, 2019, and September 26, 2019, noting that the circuit court had not yet ruled on his previous motion, Q.L. filed renewed motions for an extension of time. On September 27, 2019, the circuit court set the matter for an October 9, 2019, hearing. On October 9, 2019, over Y.S.'s objection, Q.L. was granted until October 24, 2019, to file his amended posttrial motion.

¶ 106  On October 16, 2019, the circuit court entered a written order on its August 15, 2019, bench ruling. When memorializing its decision to grant Y.S.'s relocation petition, the court indicated that its consideration of the relevant statutory factors had been significantly influenced by Q.L.'s recent conduct. The court noted, *inter alia*, that Q.L. had been placing "as much cultural pressure on [Y.S.] as possible in the hope that she would capitulate to his desires." The court found that Q.L. had "enlisted his attorneys, his traditional Chinese parents, and at times[,] his innocent children, in his efforts to place the full cultural dishonor and shame on [Y.S.] for having ambition beyond her traditional Chinese mother/wife caste." The court stated that while it was sympathetic to Q.L.'s views regarding discipline and hard work, it was not sympathetic to Q.L.'s bias against women or "his attempts to manipulate the children." The court indicated, however, that it had "intentionally considered its own bias" so that the best interests of the minors "would be the only considerations."

¶ 107 The court also referenced Q.L.'s abusive behavior towards Y.S., noting that although Y.S.'s culture had groomed her to accept Q.L.'s mistreatment, the court was not required to ignore it. The court specifically noted that on two separate occasions, B.L. had been "put into the middle of physical altercations between her parents," which was "an overwhelming fact that weighed heavily in favor of granting the petition for relocation."

¶ 108 The court indicated that the obvious "switch" in Q.L.'s legal tactics following the filing of the GAL's report and recommendation was also revealing. Noting that the parties had wanted to conclude the trial prior to the start of the upcoming school year, that all discovery had been required to be completed before the trial date was set, and that Q.L.'s request that a Chinese translator be present at trial had previously been granted, the court observed that "after being certain the matter was ready for trial a month earlier," Q.L. had engaged in a series of delay tactics after receiving the GAL's report recommending that Y.S.'s petition to relocate be granted. Rejecting Q.L.'s suggestions that he had not been aware of the GAL's position on SIU's board of trustees until after receiving her report, the court concluded that his motion to substitute the GAL and strike her report had been filed to cause delay and to otherwise give Q.L. "another bite at the apple on the GAL recommendation." The court suggested that Q.L.'s attempts to obtain Clipper's records had been halfhearted and likewise made to cause unnecessary delay. The court noted that Q.L.'s co-counsel entered her appearance 12 days before the set date of the trial and had immediately requested, *inter alia*, that the trial be continued. The court further noted that delaying the trial would have ensured that the minors' upcoming school year would not

37

have commenced in Indiana, which would have furthered his position that the children should remain with him.

¶ 109  When discussing the factors relevant to Y.S.'s petition to relocate, the court noted, *inter alia*, that both parties were admirably committed to their children, that both parties had done a remarkable job coparenting and maximizing their roles as parents, and that both children were undoubtedly bonded with Q.L.'s parents. The court also noted that the present case was a "very difficult case" and that the relocation would likely cause the children considerable "short[-]term pain." The court concluded, however, that in the long run, it was in the children's best interests that Y.S.'s petition be granted.

¶ 110  With respect to the allocation of the parties' decision-making responsibilities, the court noted that both parties had conceded that the responsibilities would be shared and that nothing suggested that they would be unable to jointly make decisions with the children's best interests in mind. The court accordingly ordered that the parties' decision-making responsibilities be shared with respect to both minors.

¶ 111  With respect to the allocation of parenting time, the circuit court noted that although "primary parenting time" had been decided by the granting of Y.S.'s petition to relocate, the court was nevertheless required to allocate Q.L.'s parenting time according to the children's best interests. After considering the relevant statutory factors, the court "made permanent" the temporary visitation schedule that had been ordered on August 15, 2019, but did not address the minors' spring, holiday, or summer breaks. The court directed the parties to submit a final parenting time order within 30 days and set the cause for a November 2019 case management conference.

¶ 112 On October 24, 2019, Q.L. filed a 36-page amended motion to reconsider or vacate judgment. In addition to realleging Q.L.'s previous claims pertaining to Clipper's testimony and records, the amended motion argued, *inter alia*, that the circuit court acted outside the scope of its jurisdiction when entering its order awarding Y.S. the "primary allocation" of parenting time because the "issue of allocation" was not before the court and that the court erred in prohibiting Q.L.'s counsel from making offers of proof when questioning the GAL. With respect to the offers of proof, Q.L. suggested that had he been allowed to ask the GAL the questions that he had wanted to ask, she would have changed her opinions and recommendation, and the result of the trial would have been different.

¶ 113 On November 12, 2019, Q.L. filed a motion to clarify the circuit court's directive that the parties submit a final parenting time order for the court's approval. In the motion to clarify, Q.L. again argued that the circuit court lacked the jurisdiction to allocate the parties' parenting time, stating that "the issue that was tried in July and August 2019 was that of relocation, not allocation."

¶ 114 On November 20, 2019, the cause proceeded to the previously scheduled case management conference. The record on appeal does not include a transcript of the proceeding, but in its docket entry, the circuit court stated, "If the parties are unable to jointly decide the 2019 holidays[,] they need to contact [the GAL] to get a recommendation. Until further order, the previous parenting time [schedule] shall be adhered to unless the parties agree otherwise." On November 20, 2019, the court also denied Q.L.'s amended motion to reconsider or vacate judgment, entered judgment on its

order granting Y.S.'s petition to relocate, and set the cause for a January 2020 case management conference.

¶ 115  On November 22, 2019, Y.S. filed a petition for temporary relief, indicating that there had been a substantial change of circumstances in that it was no longer feasible for the parties to meet in Mt. Vernon every weekend for their custody exchanges. The petition further advised that there was presently no schedule in place for the minors' spring, holiday, or summer breaks. The petition requested that the circuit court enter an order modifying Q.L.'s parenting time and establishing a visitation schedule for the minors' breaks. On November 26, 2019, Q.L. filed a timely notice of appeal from the circuit court's judgment denying his amended motion to reconsider or vacate judgment.

¶ 116                    DISCUSSION

¶ 117  On appeal, Q.L. does not challenge the sufficiency of the evidence supporting the circuit court's determination that it was in the minors' best interests that they be allowed to relocate to Indiana with Y.S. He rather argues that we should vacate the circuit court's judgment and remand the cause for a new trial because the GAL had a conflict of interest, the circuit court was admittedly biased, and the circuit court's rulings with respect to his offers of proof and his attempts to obtain Clipper's records denied him a fair hearing. Q.L. maintains that on remand, a new GAL should be appointed, and the cause should be assigned to a new judge. Q.L. further argues that the circuit court was not authorized to enter an order allocating the parties' parenting time in conjunction with its order granting Y.S.'s relocation petition. Having thoroughly reviewed the record, we conclude that none of these claims are meritorious.

¶ 118  At the outset, we will address Q.L.'s argument that the circuit court was biased. "Judges, of course, are presumed impartial, and the burden of overcoming the presumption by showing prejudicial trial conduct or personal bias rests on the party making the charge." *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 31. Because a judge's allegedly erroneous findings and rulings are insufficient reasons to believe that the judge had a personal bias for or against a party, "the party making the charge of prejudice must present evidence of prejudicial trial conduct and evidence of the judge's personal bias." *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002). Furthermore, judicial remarks indicating disapproval or hostility to a party will not support a claim of judicial bias unless the remarks " 'reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.' " *Id.* at 281 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

¶ 119  Here, emphasizing that in the circuit court's written judgment order, the court stated that it had "considered its own bias," Q.L. suggests that the circuit court's "self-admitted bias" permeated the proceedings below and improperly influenced the court's judgment. Q.L. maintains, *inter alia*, that on the second day of trial, the circuit court displayed its bias by forcing him to hurriedly present his evidence and by improperly limiting his cross-examination of the GAL with respect to her bias. We reject these contentions as belied by the record.

¶ 120  We initially note that in context, the circuit court's reference to its "own bias" was a reference to its self-admitted bias against Q.L.'s bias against women and Q.L.'s "attempts to manipulate the children." More importantly, however, is that the court specifically stated that it had "intentionally considered its own bias" so that the best interests of the minors

41

"would be the only considerations." The circuit court was in the best position to determine whether it was prejudiced against Q.L. (see *Kamelgard v. American College of Surgeons*, 385 Ill. App. 3d 675, 681 (2008)), and considered in context, the court's comments fail to demonstrate an inability to render a fair judgment or "control [its] personal biases," as Q.L. asserts on appeal. The comments rather reveal that the circuit court was aware of its personal biases and consciously set them aside.

¶ 121 We find Q.L.'s contentions that the circuit court forced him to present his case in "short and scant" fashion and improperly limited his cross-examination of the GAL are also unsupported by the record. We initially note that on the first day of trial, the circuit court admonished Q.L. that while he was entitled to make "a good clean record," many of his inquiries tended to delve into irrelevant matters, "minutia," and material that had already been covered. The court also observed that Q.L. tended to divide general questions into "itty bitty parts." On several occasions, the court prompted Q.L. to "move on" or "please keep moving." As previously noted, on the second day of trial, the circuit court admonished the parties that it had another trial scheduled that afternoon, and when Q.L. called the GAL to testify, the court specifically admonished him to "restrict the questions" to matters that were relevant. The court further advised him that while it would allow him some leeway to explore the GAL's possible bias, it was not going to allow him to relitigate his motion to substitute the GAL and strike her report.

¶ 122 Despite the circuit court's admonishments, when questioning Y.S. and the GAL on the second day of trial, Q.L. repeatedly questioned them as to matters that had previously been addressed and repeatedly attempted to explore matters that had little or no relevance.

42

In response, the circuit court repeatedly explained that the trial was not a "deposition" and again advised Q.L. to avoid delving into "minutia." Similarly, when Q.L. testified, he was questioned about irrelevant matters, such as a private school that B.L. was not going to attend. At times, Q.L. also gave lengthy narrative answers, which prompted the circuit court to advise Q.L.'s attorney to "move on" or "get to the point." At one point, when Q.L.'s counsel insisted that he had "been trying to be cognizant of the time," the circuit court observed that it did not "appear that way."

¶ 123  "A trial court's decisions on the admissibility of evidence and the scope of cross-examination on an appropriate subject of inquiry are reviewed for abuse of discretion." *People v. Reese*, 2017 IL 120011, ¶ 75. "An abuse of discretion occurs where no reasonable person would agree with the position adopted by the trial court." *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176 (1997). The circuit court also has the inherent authority to manage and control the presentation of evidence to avoid the needless consumption of time. Ill. R. Evid. 611(a)(2) (eff. Oct. 15, 2015).

¶ 124  Here, despite Q.L.'s repeated claims to the contrary, the record indicates that he was not forced to hurriedly present his case. The record rather indicates that the circuit court was quite patient under the circumstances and did not abuse its discretion to preclude the admission of repetitive or irrelevant evidence. Moreover, Q.L. was fully afforded his right to cross-examine the GAL about her report and recommendation (see 750 ILCS 5/506(a)(2) (West 2018)), and in its discretion, the court granted him considerable latitude to explore her potential bias. We also note that while Q.L. complains that his testimony was "cut short," he does not indicate what further evidence he would have presented.

43

¶ 125 We relatedly find no error with respect to the circuit court's rulings denying Q.L.'s purported offers of proof as to what evidence might have possibly changed the GAL's opinions and recommendation. The so-called offers of proof were essentially requests to ask the GAL hypothetical questions, to which Y.S.'s objections the court was within its sound discretion to sustain. See *Modelski v. Navistar International Transportation Corp.*, 302 Ill. App. 3d 879, 886 (1999) (stating "testimony grounded in guess, surmise, or conjecture, not being regarded as proof of a fact, is irrelevant as it has no tendency to make the existence of a fact more or less probable"); see also *Schiff v. Friberg*, 331 Ill. App. 3d 643, 656 (2002) (noting that the trial court has the discretion to allow or deny the admission of evidence for attempted impeachment purposes, and the court's decision will not be disturbed absent an abuse of that discretion). Moreover, summary speculation is an insufficient offer of proof (*People v. Andrews*, 146 Ill. 2d 413, 421 (1992)), and the alleged evidence that Q.L. later claimed had been improperly excluded consisted of unsupported conclusions that had he been permitted to ask the GAL the questions he had wanted to ask, she would have changed her opinions and recommendation. In any event, "[t]he two primary functions of an offer of proof are to disclose to the trial judge and opposing counsel the nature of the offered evidence, enabling them to take appropriate action, and to provide the reviewing court with a record to determine whether exclusion of the evidence was erroneous and harmful." *People v. Thompkins*, 181 Ill. 2d 1, 9 (1998). Here, these functions were ultimately served, and we cannot conclude that the circuit court's rulings on Q.L.'s purported offers of proof were erroneous or harmful.

¶ 126 With respect to Q.L.'s argument that the cause should be remanded for a new trial because the GAL had a conflict of interest, whether to disqualify the GAL on the basis of the alleged conflict required the circuit court to resolve factual disputes regarding conversations that occurred when the GAL was appointed in May 2018. As a result, the denial of Q.L.'s motion to substitute the GAL and strike her report and recommendation was directed to the sound discretion of the circuit court and will not be disturbed on appeal absent an abuse of discretion. *Schwartz*, 177 Ill. 2d at 176. We note that the abuse-of-discretion standard recognizes that the circuit court is in a superior position to evaluate evidence and determine credibility. *In re Marriage of Wade*, 158 Ill. App. 3d 255, 265-66 (1987).

¶ 127 It is well established that a party waives the right to object to an alleged conflict of interest by failing to promptly raise the issue. See *In re Possession & Control of the Commissioner of Banks & Real Estate of Independent Trust Corp.*, 327 Ill. App. 3d 441, 479 (2001). "In addition, the party seeking disqualification carries a heavy burden to prove that his motion for disqualification is not being brought as a tactical weapon to gain undue advantage in the litigation." *In re Marriage of Stephenson*, 2011 IL App (2d) 101214, ¶ 19; see also *Miller v. Norfolk & Western Ry. Co.*, 183 Ill. App. 3d 261, 267-68 (1989) (noting that a motion to disqualify is generally viewed with caution and should not be granted where the alleged conflict is merely hypothetical).

¶ 128 Here, the circuit court rejected Q.L.'s claims that he had been unaware of the GAL's position on SIU's board of trustees until after he received her report in June 2019. The court obviously credited the opposing representations made by the GAL and Y.S., which

45

indicated that Q.L. had knowingly waived any alleged conflict arising from the GAL's representation after her position on the board had been fully disclosed and discussed when she was appointed in May 2018. The court thus concluded that Q.L.'s motion to substitute and strike had been filed to delay the pending trial and otherwise give Q.L. "another bite at the apple on the GAL recommendation." The record on appeal supports the circuit court's findings on the matter and further supports a finding that an actual conflict never existed. As noted, the GAL advised the court that she had no idea who Y.S. was prior to May 2018, that she would have withdrawn from the parties' case had she felt that she could not have been impartial, and that Y.S.'s status as an SIUE employee had no bearing on her opinions or recommendation. Under the circumstances, we conclude that, at most, the GAL's participation in the present case gave rise to a tenuous appearance of impropriety that was fully explored, explained, and waived. We accordingly find no error with respect to the circuit court's rulings on the issue.

¶ 129 We likewise find no error with respect to the circuit court's rulings regarding Clipper's testimony and records. On appeal, Q.L. argues, as he maintained below, that Clipper's testimony should have been stricken and that all of the information that Clipper provided to the GAL should have been stricken from her report. Q.L. bases these claims on his suggestions that Clipper's records were "inappropriately withheld" and that Clipper "testified as an expert" and provided expert opinions. Again, however, we find that these claims are without merit.

¶ 130 Clipper was neither disclosed nor called as an expert witness, and he did not testify as an expert witness. He offered no expert opinions or recommendations to the circuit court

46

or the GAL, and as the circuit court noted, he had not been tasked with evaluating any of the relevant statutory factors. Clipper testified as a fact witness (see *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 209 Ill. App. 3d 192, 197 (1991)) and was called by Q.L. so that he could be cross-examined as to whether he had influenced or participated in the preparation of the GAL's report. To that end, Clipper's testimony revealed that to the extent he offered the GAL any opinions regarding the parties, they were his personal opinions on matters such as the parties' personalities, parenting styles, and interpersonal interactions. He further explained that he viewed his communications with the GAL as "comparing" and "contrasting" their impressions of the parties' situation. Referencing Clipper's testimony that he had a therapeutic relationship with the entire family, Q.L. intimates that Clipper's discussions with the GAL were improper because the communications violated his "patient-therapist confidentiality" rights. Clipper explained, however, that it was undisputed that B.L. was his only "client" in the situation, and Q.L. testified that he never considered himself to be Clipper's patient. Clipper further indicated that Q.L. was fully aware that any information gleaned from B.L.'s counseling sessions would be shared with the GAL. Thus, even assuming that a therapist-patient privilege existed, Q.L. waived it under the circumstances. See *In re Marriage of Slomka*, 397 Ill. App. 3d 137, 142 (2009) (noting that "the patient-therapist privilege must be asserted by either the patient or the therapist or it is considered waived").

¶ 131 With respect to Q.L.'s contention that Clipper's records were inappropriately withheld, the record on appeal supports the circuit court's findings that Q.L.'s efforts to obtain the documents were halfhearted and among the numerous delay tactics that Q.L.

pursued after receiving the GAL's report and recommendation. As noted, after Q.L. was provided with a summary of Clipper's records approximately two weeks before the trial was scheduled to commence, Q.L. requested that the cause be set for a hearing on his motion to obtain a court-authorized subpoena for the records. When that request was denied, Q.L. filed a last-minute motion *in limine* to compel the production of the records. When denying the motion *in limine* at the commencement of the trial, the circuit court noted that Clipper had provided Q.L. with a summary of B.L.'s treatment and that whatever questions remained about the records could be addressed when Clipper testified.

¶ 132 The circuit court has wide discretion in controlling the scope and process of discovery, and an abuse of that discretion will only be found if the court's rulings either prevented the ascertainment of the truth or substantially affected a critical issue in the case. *United Nuclear Corp. v. Energy Conversion Devices, Inc.*, 110 Ill. App. 3d 88, 104-05 (1982). Here, the circuit court's rulings on Clipper's records did neither, and we find no abuse of discretion in the manner in which the circuit court proceeded. At trial, Clipper was questioned about the records and his refusal to provide them, and he and the GAL were both extensively questioned as to their discussions about the parties' situation, Clipper's involvement in the case, and the GAL's report and recommendation. Although Q.L. maintains that he needed Clipper's records so that he could effectively cross-examine Clipper and the GAL, that argument is belied by the record of the proceedings. We further emphasize that Clipper testified that he would have allowed Q.L. to examine, but not copy, the records, had Q.L. requested to do so.

¶ 133 As an aside, we note that while Q.L. contends that by allowing the GAL to use information gained from Clipper, the circuit court "transmuted her into the fact finder," the record indicates that the court was fully aware that the GAL had not been appointed to act in "the role of a surrogate judge" (750 ILCS 5/506(a-5) (West 2018)) and that it was ultimately free to accept or reject her offered opinions and recommendations "in whole or in part" (*In re Marriage of Felson*, 171 Ill. App. 3d 923, 928 (1988)). Moreover, as the "eyes and ears of the court" (internal quotation marks omitted) (*Nichols v. Fahrenkamp*, 2019 IL 123990, ¶ 46), the GAL was required to interview Clipper because he had special knowledge of the minors' circumstances (Ill. S. Ct. R. 907(c) (eff. Mar. 8, 2016)). In any event, it is readily apparent that the circuit court thoroughly and independently considered both parties' positions before arriving at a reasoned judgment and that its judgment was significantly influenced by conduct that Q.L. exhibited after the filing of the GAL's report.

¶ 134 Lastly, we find that Q.L.'s claim that the trial "was set only on the question of relocation" is clearly belied by the record and that he has waived his contention that the circuit court was not authorized to enter an order allocating the parties' parenting time in conjunction with its order granting Y.S.'s relocation petition.

¶ 135 In November 2017, the circuit court entered its temporary order granting Q.L. limited parenting time with the minors. In May 2018, Y.S. filed her petition to relocate the children to Indiana. Three months later, when Y.S. moved to Indiana, the circuit court entered its order granting Q.L. custody of the children during the week and Y.S. parenting time on the weekends. Y.S.'s relocation petition requested that she be granted leave to relocate the children to Indiana and that a "reasonable parenting time schedule" be

established for Q.L. The petition necessarily involved a modification of the parties' parenting time (see 750 ILCS 5/609.2(a), 610.5(a) (West 2018)) and could fairly be interpreted as asking that their then-existing custody arrangement be switched. It is otherwise undisputed that at all times thereafter, both parties were aware that a reallocation of their parenting time was an issue that would require resolution should Y.S.'s relocation petition be granted. The allocation of the parties' parenting time was specifically referenced in Q.L.'s petition to appoint a GAL, Q.L.'s "Interrogatories Pertaining to Allocation of Parental Responsibilities/Parenting Time," the GAL's report, the circuit court's mediation order, and the circuit court's order setting the cause for trial. The focus of the case has always been on who would be the minors' primary custodial parent. To the parties' credit, that they would jointly share their decision-making responsibilities as to their children has never been an issue. In any event, to the extent that Q.L. argues that Y.S.'s relocation petition failed to strictly comply with the pleading requirements set forth in Illinois Supreme Court Rule 902(a) (eff. Mar. 8, 2016), any defect was undoubtedly waived and harmless under the circumstances. See *Ragan v. Columbia Mutual Insurance Co.*, 183 Ill. 2d 342, 354-55 (1998).

¶ 136   Waiver aside, Q.L. seemingly argues that because Y.S.'s relocation petition did not include the word "allocation" and because the circuit court referred to the trial as a hearing on Y.S.'s "Petition to Relocate" and "Petition for Relocation," the court lacked the authority to enter an allocation order. This contention is clearly without merit, the cases Q.L. cites in support of his argument are readily distinguishable (see, *e.g.*, *In re Marriage of Fox*, 191 Ill. App. 3d 514, 521 (1989) (concluding that the  respondent "could not have

known custody of her children was at issue in the contempt proceedings until the trial judge made his decision")), and Q.L. again takes the circuit court's words out of context.

¶ 137 As a final aside, we note that as evidenced by the circuit court's recognition that the parties were experiencing problems agreeing on the division of their parenting time over the minors' breaks and the fact that Y.S. has already filed a motion to modify the parties' existing parenting time schedule, it unfortunately appears that the services of the GAL or the mediator might be required to resolve their pending issues. During the proceedings below, the circuit court instructed the parties to "work together to the extent possible to maximize each parent's relationship with the children." We instruct them to do the same and further urge them to amicably resolve their differences keeping the best interests of the children in mind.

¶ 138                                    CONCLUSION

¶ 139 For the foregoing reasons, the circuit court's judgment granting Y.S.'s petition to relocate and allocating the parties' parenting time and decision-making responsibilities is hereby affirmed.

¶ 140 Affirmed.